COURTNEY, APPELLANT, *v.* CONTINENTAL LAND AND CATTLE COMPANY, RESPONDENT.

[Submitted December 10, 1895. Decided January 13, 1896.]

SALES OF PERSONALTY—*Agency—Broker's commission.*—In an action by a cattle broker to recover commission for negotiating a sale it appeared that the negotiations which were almost entirely by telegraph, were begun by the plaintiff telegraphing the defendant company, at the instance of a prospective buyer, for its lowest price on certain cattle; that in subsequent dispatches to the defendant plaintiff spoke of "his buyer;" asked for an option and for time for his buyer to see the cattle; that the defendant, toward the conclusion of the negotiations, asked plaintiff to whom it should make the contract and then telegraphed a contract in which plaintiff was named as purchaser; that plaintiff refused to sign this contract but forwarded another prepared by himself and in a personal letter to defendant's agent for the first time claimed commission, to which the agent replied, "Have dealt with you as principal leaving no margin for commission but am willing to sign contract allowing you $500." *Held,* that the defendant did not employ plaintiff by express or implied contract to make the sale.

SAME—*Same—Contract ratification.*—In an action by a cattle broker, who was not employed by the defendant, to recover commission for negotiating a sale, it appeared that at the conclusion of the negotiations the plaintiff having refused to sign a contract of sale to himself forwarded a contract naming another person as purchaser and describing only one brand, whereas the defendant had three brands, which the plaintiff knew, and which were all required to fill the contract, and at the same time in a letter to defendant's agent claimed a commission. The agent refused to sign the contract describing but one brand and refused to allow commission. Plaintiff replied that there would be no trouble about brands as the one described was used as a general brand. The agent then wired that he would sign a contract covering all brands but would pay no commission, to which plaintiff replied: "You accepted price and terms and I made contract which has been executed by my buyer. He is out of town

but I will wire him that I can duplicate purchase from you at much lower prices and recommend that deal with you be dropped. Brand matter all right." Before this was received the agent had left to see the intended vendee and after the latter's refusal to modify the contract as to brands wired the plaintiff that the deal was off. In the mean time the defendant's president replied to plaintiff's last dispatch that the agent was en route but that defendant would "stand by contract allowing commission." *Held,* that since this promise by defendant's president was made in reliance upon the plaintiff's assurance that the brand matter was all right, which was untrue. it was made upon a misunderstanding of the true facts for which plaintiff was responsible, and therefore did not act as a ratification of plaintiff's contract, or bind the defendant to pay the commission.

AGENCY—*Evidence.*—Where the plaintiff had assumed to act as an agent for the defendant without having been employed for that purpose, a letter written by him to the defendant in which he admitted that he was acting as agent for both parties to the contract, though written after the contract had been abandoned, is admissible upon the question of plaintiff's good faith in the transaction.

*Appeal from Seventh Judicial District, Custer County.*

ACTION to recover commission for negotiating a sale of cattle. Judgment was rendered for the defendant below by MILBURN, J. Affirmed.

Statement of the case by the justice delivering the opinion.

The plaintiff alleges in his complaint that he is a broker at Miles City, in this state, engaged in selling range cattle and live stock generally, on commission, which fact was known to defendant; that the defendant is a foreign corporation, organized under the laws of the state of Texas, and doing business in this state; that the business of said defendant corporation in this state is the raising, breeding, branding, buying and selling of cattle and other live stock; that in the month of May, 1890, the defendant, by its authorized agent, John W. Buster, desired and requested the plaintiff to sell for it 6,000 three and four year old spayed heifers, and 2,000 steers of the same ages, which cattle the defendant then had on its ranges; that, in pursuance of such request, plaintiff did secure a purchaser for said cattle, and did secure an offer for said cattle from Nelson Morris, of Chicago, through his authorized agent, I. Myer, of $26 per head for said heifers and $38 per head for said steers, which said offer plaintiff immediately communicated to said defendant, and which said offer defendant accepted by and through its said agent, Buster; that said Morris was a respon-

sible purchaser; that defendant agreed to pay plaintiff a commission of 1 per centum upon the total amount of such sale, the total amount being $232,000, that after the negotiation of such contract for the sale of said cattle, and after the defendant had accepted the same, the defendant refused, and still refuses, to ratify the same, or deliver said cattle, or to pay plaintiff his commission, although the time for the performance of the contract has elapsed. Plaintiff sues for $2,320, claimed to be due as commission on the amount of the sale of the cattle. The material allegations of the complaint are denied by defendant's answer.

The case was tried to the court without a jury.

The court made the following findings of fact:

"(1) That the plaintiff was at the time of bringing this action, and for five years previous to that time had been, a broker in Miles City, engaged in the business of selling cattle and live stock on commission, as such broker.

"(2) That the defendant is a corporation organized and doing business in Montana, as in plaintiff's complaint in this action alleged.

"(3) That in the year 1890 one I. Myer was the duly-accredited agent for Nelson Morris, of Chicago, Illinois, for the purchase of cattle in the state of Montana for said Morris, with authority to draw drafts and make payments for cattle so purchased on account of the said Morris by his said agent.

"(4) That in the month of May, 1890, the said Myer, as such agent, approached the plaintiff in this action for the purpose of purchasing cattle of the defendant company.

"(5) That the said plaintiff on the 26th day of May, 1890, opened negotiations by telegraph with John W. Buster, who was then in Texas, and was the general manager of the defendant company, in relation to the sale of its cattle to Morris.

"(6) That the said I. Myer, agent for the said Nelson Morris, visited the range where the cattle of the defendant were running, for the purpose of inspecting them with a view to the purchase thereof.

"(7) The court finds that the telegrams mentioned in the

stipulation filed June 18, 1891, are true copies of the telegrams sent by and between, and received by, the plaintiff and officers of the defendant.

''(8) That subsequently, and after the said Myer had visited the ranges for the purpose of inspecting the said cattle, the plaintiff, by telegrams dated June 15 and June 16, 1890, informed the said Buster that the buyer would take all of the defendant's spayed heifers at twenty-six dollars; that it is shown by the evidence in this case, and found as a fact herein, that this offer of the buyer was intended to embrace in the purchase all the spayed heifers, three and four years old, at twenty-six dollars per head, estimated at six thousand head, more or less, and also two thousand steers, three and four years old, at thirty-eight dollars per head, branded with the brand known as the 'Hash Knife Brand,' which cattle were on the ranges of the defendant company in Montana and Dakota; that the said plaintiff, in sending the offers of said Myer to said Buster on the dates in this finding named, requested from said Buster an answer to such offer.

''(9) That Exhibit A to deposition of John W. Buster is a true copy of the contract drawn up by William Courtney and signed by the agent of Nelson Morris.

''(10) That on the 27th day of June, 1890, upon the signing of said contract by the agent of Morris, a draft for forty thousand dollars was made by the said Nelson Morris, payable to the Stockgrowers' National bank, to be paid to the defendant company when the contract should be executed by said defendant company.

''(11) That immediately upon the signing of the said contract by the said Nelson Morris as aforesaid, and the depositing of the draft as hereinbefore found, the said contract was by the said William Courtney forwarded to John W. Buster, general manager of said company, to Dallas, Texas, with a telegram sent at the same time by the said William Courtney to the said John W. Buster, stating that he had sent a *pro forma* contract for approval by the said defendant; that there was transmitted with the said contract a letter from the plaint-

iff in this action to the said John W. Buster, informing said Buster that contracts in duplicate were inclosed, signed by Morris, and requesting the said defendant to sign one copy and retain one, and further informing the said Buster that he could either make draft for forty thousand dollars on I. Myer, Mr. Morris' agent, which would be paid on presentation at the Stockgrowers' Bank at Miles City, or that, immediately upon receipt at Miles City of contract duly executed by the defendant company, the plaintiff would telegraph said Buster, and send the amount of forty thousand dollars in New York exchange, or exchange on the Bank of Commerce, St. Louis, as the defendant might desire; that the contract referred to in these findings is the contract in evidence in this cause.

"(12) That the said contract so sent by the said Willam Courtney, and signed as aforesaid, was received by the said John W. Buster on the 2d day of July, in the afternoon of said day, at Dallas, Texas.

"(13) The court finds that William Courtney was not acting as broker for Nelson Morris, but was acting with the sole intent of earning a commission of one per centum on gross sales, from the defendant.

"(14) That William E. Hughes, president, and John W. Buster, general manager, through the whole transaction acted for the defendant company in the negotiation of the attempted sale to Morris.

"(15) That after the sending of the contract to Buster to sign, and after his said telegram of July 2d to plaintiff, said Buster, instead of executing the said contract, took it, acting for the company, to Chicago, and interviewed the said Morris, and that, after conversation with him, he, the said Buster, .destroyed the said contract, having declined to sign the same, giving as his reason (see Buster's general deposition) that the company could not possibly furnish cattle in the said brand (hashknife), inasmuch as they did not have more than a small percentage of the number required by the contract, and that the destruction of said contract was made without further consultation with the plaintiff, and without his knowledge or consent.

"(16) That one per centum of the amount of the gross sales of the character contemplated in this matter is a reasonable commission for completed services.

"(17) That the defendant company did not, in the matter of the contemplated sale, request or employ the plaintiff to act as its broker in the premises.

"(18) That the voluntary acts of the plaintiff in the negotiations in this matter were adopted, and his voluntary acts as agent were ratified. This finding is outside of the pleadings, and solely for the purpose of review, and is not considered by this court in arriving at its judgment. Paragraph 5 of plaintiff's amended complaint 'alleges that the said defendant has hitherto refused, and still refuses, to ratify the said sale, although the time in which the said contract was agreed to be performed has elapsed.'

"(19) The court finds that the acts of the plaintiff were voluntary until the receiving of the contract, July 2d; that the plaintiff had no contract, express or implied, with the defendant, by which he became its agent or broker to sell its cattle.

"(20) That plaintiff never disclosed to the defendant during the whole of the negotiations for the sale of these cattle, beginning with the first telegram, May 26, 1890, to the sending of the contract dated June 27, 1890, that he claimed to be the agent or broker of defendant.

"(21) That after this contract had been signed by Morris, and in the same mail to Mr. Buster, manager of the defendant company then in Texas, plaintiff sent a personal letter to such manager of defendant, making the claim for the first time that he had been representing the defendant, and demanding commissions for the alleged sale of its cattle; and the defendant did not know of said claim until the afternoon of July 2, 1890.

"(22) That the contract in controversy, and signed by Nelson Morris on the 27th day of June, 1890, and forwarded to defendant, is in words and figures following, to wit: 'This agreement made and entered into this 27th day of June, 1890,

by and between the Continental Land & Cattle Company of Dallas, in the county of Dallas, in the state of Texas, party of the first part, and Nelson Morris, of Chicago, in the county of Cook, and state of Illinois, party of the second part, witnesseth, that the said party of the first part hereby sells and agrees to deliver unto the said party of the second part all their spayed heifers, three and four years old, estimated at almost six thousand head, more or less, and two thousand head of their steers, same ages, now on the ranches of the said party of the first part, Little Missouri River and Box Elder and Little Beaver creeks, in Montana and Dakota, branded and marked (known as the 'Hash-Knife Brand') on both sides; said spayed heifers to be good, merchantable cattle, with no stags, runts, shanghais, cripples or big jaws among them; one-half of said steers to be three years old, and one-half to be four years old, and all full ages, with no short threes among them. For and in consideration of the above sale, said party of the second part has purchased and agrees to receive said cattle, and pay therefor at the price of twenty-six (26) dollars per head for said spayed heifers, and thirty-eight (38) dollars per head for said steers; the sum of forty thousand dollars ($40,000) to be paid at the execution of this contract, the receipt of which is hereby acknowledged, and the balance on delivering of said cattle on the cars at Dickinson, on the N. P. R. R., during the months of August, September, and October, 1890. Party of the second part to receive from said party of the first part a clear and good bill of sale of said cattle on completion of delivery of said cattle and payment of same. In witness whereof, the parties to this agreement have hereunto set their hands and seals this 27th day of June, A. D. 1890. Nelson Morris. [Seal.] I. Myer, Agent. [Seal.] Witness: William Courtney. J. B. Collins.

"(23) All of the negotiations, excepting as to commissions, beginning with the first telegram, on the 26th day of May, 1890, were finally merged in the written instrument set out in finding No. 22.

"(24) That the defendant company could not have furnished

more than six hundred head spayed heifers in the hash-knife brand, and could have furnished the two thousand steers in the said brand.

"(25) The cattle attempted by defendant to be sold under said contract, as set forth in finding No. 22, were branded with three brands, to wit: The hash-knife, the mill-iron, and the letter W. About one-fourth of said cattle were branded with the hash-knife brand, and the others with the other two brands.

"(26) The plaintiff had been a cattle broker at Miles City, Montana, the place where this attempt was made to sell the defendant's cattle, for about ten years previous to the attempt to make said sale; and at the time of such sale he had the Montana Brand Book before him, and knew that there was recorded there more than one brand of the defendant.

"(27) I. Myer, the agent of Nelson Morris, and Nelson Morris; both refused to modify the contract set out in finding No. 22, so as to make it include the other brands of the defendant, when requested so to do by J. W. Buster, manager, etc., and said Morris insisted that he had purchased only the hash-knife brand of cattle, with which he was personally acquainted, and not the other brands of the defendant company, with which he was not acquainted.

"(28) William E. Hughes, the president of the defendant company, promised, by telegram dated the 5th of July, 1890, to pay the plaintiff commissions at the rate of one per cent. upon the gross amount of the alleged sales of said cattle, but when he made this promise he had been assured by the plaintiff that the brand matter was all right.

"(29) Said promise to pay commissions, as set out in finding 28, was made without consideration.

"(30) The defendant company was not able to avail itself of any benefits from said contract, as set out in finding No. 22, because it embraced only the hash-knife brand; and said company did not have cattle enough in said brand to fill said contract, and could not derive any benefit whatever from said contract.

"(31) The limitation in the contract, in finding No. 22, that the cattle were branded with the hash-knife brand, applies to all the cattle, both spayed heifers and the steers.

"(32) The defendant could not have fulfilled said contract, except by the delivery of all of their spayed heifers three and four years old, estimated at almost six thousand head, more or less, and two thousand head of their steers, same ages, etc., all branded in the hash-knife brand; and this being impossible, as the court has before found as a fact, said limitation rendered said contract nugatory, and the same was of no benefit to the defendant.

"(33) The promise to pay commissions to the plaintiff on the part of Hughes, being without consideration, is void, and does not entitle the plaintiff to recover said commissions on account of said promise."

Upon such findings the court rendered judgment for the defendant for costs. Plaintiff moved the court for new trial, which was denied. From the judgment and order denying a new trial, the plaintiff appeals.

*Strevell & Porter*, for Appellant.

"The legal effect of the subsequent ratification of a previously unauthorized act is precisely equivalent to a previous delegation of authority to do the act." (*Irons* v. *Reyburn*, 11 Ark. 378; *McGowan* v. *Gerrerd*, 2 Stew. Ala. 479; *Clark* v. *Reensdyke*, 9 Cranch. 153; *Reynolds* v. *Dothard*, 11 Ala. 531; *Lee* v. *Fontaine*, 10 Ala. 755.) "An unauthorized act by one assuming to be an agent for another may be ratified by the principal, and such a ratification gives to the act the same effect as if it were previously duly authorized." (1 Am. & Eng. Encyc. of Law, 429; *Sentell* v. *Kennedy*, 29 La. Ann. 679; *Rich* v. *State National Bank*, 7 Neb. 201; *Lee* v. *West*, 47 Ga. 311; *Bray* v. *Gunn*, 53 Ga. 144; *Weaver* v. *Ogletree*, 39 Ga. 586; *Carnes* v. *Bleecker*, 12 Johns. 300; *Peterson* v. *Mayor*, etc., 17 N. Y. 499; *Rogers* v. *Kneeland*, 10 Wend. 218; *Weston* v. *Gray*, 4 Abb. Pr. 250; *Oliver* v. *Johnson*, 24 La. Ann. 460; *Salem* v. *Gloucester Bank*, 17 Mass. 1; *Froth-*

*ingham* v. *Haley*, 3 Mass. 68; *Lent* v. *Paddleford*, 10 Mass. 230; *Fisher* v. *Willard*, 13 Mass. 379; *Bulkley* v. *Derby Fishing Co.*, 2 Conn. 225, s. c., 7 Am. Dec. 271; *Church* v. *Sterling*, 16 Conn. 388; *Baker* v. *Cotter*, 25 Me. 236; *Wilson* v. *Dame*, 58 N. H. 392; *Clark* v. *Van Reinsdeck*, 9 Cranch. 153; *Goodell* v. *Woodruff*, 20 Ill. 191; *Myers* v. *Simmons*, 16 La. Ann. 370; *Williams* v. *Mitchell*, 17 Mass. 98; *Baker* v. *Byrne*, 10 Miss. 193; *Despatch, etc.*, v. *Bellamy Mfg. Co.*, 12 N. H. 205; *Workman* v. *Guthrie*, 20 Pa. St. 495; *Weisinger* v. *Wheeler*, 14 Wis. 101; *Barbour* v. *Craig*, 11 Ia. 233; *Barbour* v. *Craig*, 6 Litt. (Ky.) 213; *Cowan* v. *Wheeler*, 31 Me. 439; *Lowery* v. *Harris*, 12 Minn. 255; *Ruggles* v. *Washington Co.*, 3 Mo. 496; *Courcier* v. *Riter*, 4 Wash. 549.) When a person, or corporation, uses a broker in the matter of effecting a sale which he desires to accomplish, the law implies an obligation to pay him for his services as much as though an attorney was employed to do business in the line of his profession, or any other person or profession rendering service. (*Howland* v. *Coffin*, 47 Barb. (N. Y.) 653; *Everharat* v. *Searle*, 71 Pa. St. 256; *Steel* v. *Swan*, 21 Ind. 203; *McLeland* v. *Snyder*, 18 Ill. 58; *Brigham* v. *Shaw*, 17 Ill 58; *Graham* v. *Graham*, 34 Pa. St. 475; *Glen* v. *Salter*, 50 Ga. 170; *Frazer* v. *Gregg*, 20 Ill. 299; *Koch* v. *Emerling*, 22 How. U. S. 69; *Phelps* v. *Prusch*, 83 Cal. 626; *Middleton* v. *Findla*, 25 Cal. 76; *Fisk* v. *Sould*, 87 Cal. 321.)

*McConnell, Claybery & Gunn* and *W. F. Myers*, for Respondent.

Before a broker can claim his commissions the transaction by which they are alleged to be earned must be completed. But where he has done his part of the transaction and from no fault of his own, but by causes outside of the agency, as by the refusal of the principal to complete the contract, the contract is not consummated, the broker will be entitled to his commissions. (2 Am. & Eng. Ency. of Law, 571, 578, and notes.) ''By acting for both parties he loses his claim to commissions from his immediate employer.'' (*Everhart* v. *Searle*, 71 Pa. St.

256; *Scribner* v. *Collar*, 40 Mich. 375 (S. C.) 29 Am. Rep. 541; *Smith* v. *Townsend*, 109 Mass. 500; *Myer* v. *Hanchett*, 39 Wis. 419; *Bollman* v. *Loomis*, 41 Conn. 581.) And can enforce payment of commissions from neither. (*Rice* v. *Wood*, 113 Mass. 133.) "If the duties of a broker are executed in such a manner that no benefit results from them he is not entitled to recover either his commission, or even a compensation · for his trouble." (*Hamond* v. *Holiday*, 1 Carr. & Payne 228.) "A broker to be entitled to commissions must be actually employed by the principal. Mere volunteer services, which result in a sale, will not be sufficient." (2 Am. & Eng. Encyc. of Law, 588, note 1; *Atwater* v. *Lockwood*, 39 Conn. 45; *Pierce* v. *Thomas*, 4 E. D. Smoth (N. Y.), 354; *Glenn* v. *Davidson*, 37 Md. 365; *Hinds* v. *Henry*, 36 N. J. L. 328; *Cook* v. *Welch*, 9 Allen (Mass.) 350; *Platt* v. *Patterson*, 7 Phila. (Pa.), 135; *Keys* v. *Johnson*, 68 Pa. St. 42; *Morrow* v. *Allison*, 39 Ala. 70.) The promise was made upon the assurance of the appellant in his telegrams, that brand matter is all right; that it was simply used as a general term. The promise on the part of Hughes to pay appellant commissions was without consideration, a mere *nudum pactum*, and therefore void, and does not bind the company. (1 Parsons on Contracts, 447; *Ferrell* v. *Scott*, 42 Am. Dec. 373; *Lycoming* v. *Union*, 53 Am. Dec. 575.)

PEMBERTON, C. J.—The principal contention of counsel for appellant is that the evidence does not justify the findings and judgment of the court. The negotiations of the parties in reference to the alleged sale of cattle were conducted almost entirely by telegraph. The telegrams are all in the record. Without embodying them, we will quote so much of them as shall seem necessary, as we proceed in the discussion of the case. From an inspection of these telegrams, it clearly appears that the negotiations in reference to the sale of the cattle were opened and begun on the 26th day of May, 1890, by the plaintiff's telegraphing the defendant company at Dallas, Texas, asking for the lowest price for 500 or 2,000 spayed heifers, delivered at Mingusville or Newcastle. Telegraphic

communication was kept up, in relation to prices, numbers, kind and time and place of delivery, until the 5th of July, when it was claimed the contract was finally consummated. We think it cannot be contended, from anything in these dispatches or communications, that the defendant knew or believed the plaintiff was even pretending to represent it, in endeavoring to negotiate the sale of the cattle, until about the 1st of July. The evidence shows that the plaintiff commenced negotiations with defendant by wire at the instance of I. Myer, agent of Nelson Morris. All along, up to July, in his dispatches to the defendant, plaintiff speaks of his buyer; asks for an option, and for time for his buyer to go to the ranches and see the cattle. So apparently satisfied was the defendant that the plaintiff was not representing it in the transaction, that it telegraphed plaintiff, on the 22d of June, asking to whom it should make the contract; and on the 24th of June the defendant telegraphed a contract, in which it named the plaintiff as the purchaser. Nor did the plaintiff ever intimate that he expected commission to be paid by defendant until, the last of June, declining to sign the contract defendant had wired him, he forwarded a contract to the defendant, prepared by himself, and in a personal letter to Buster, received July 2d, claimed commission. In reply to this communication, Buster telegraphed on the 2nd of July : " Have dealt with you as principal, leaving no margin for commission, but, as the thing has gone so far, am willing to sign contract allowing you five hundred dollars."

From this consideration of the record, we are clearly of the opinion that there was ample evidence to sustain finding No. 17, to the effect that defendant did not employ the plaintiff as its broker to negotiate the alleged sale of cattle. We think the evidence also supports finding No. 20, to the effect that plaintiff made no claim to commission from the defendant until the 27th day of June, when he forwarded the contract prepared by himself, and sent the personal letter to Buster.

But counsel for appellant contends that, even if no contract, express or implied, has been shown, as alleged in the com-

plaint, still the evidence shows a ratification of the contract of sale by the defendant. When plaintiff sent the contract of sale, on which he sues, to the defendant for its signature, which was received at Dallas, Tex., on the 2d of July, there was only one cattle brand (the "hash-knife") mentioned therein, although the defendant owned other brands, which fact plaintiff knew, or should have known, as the evidence shows. Buster, immediately on receipt of this contract, telegraphed plaintiff: "Cannot sign contract, as it only includes one brand,—we have three. Besides, don't think, under circumstances, we should pay commission. Shall start Montana at once." Upon receipt of this dispatch, plaintiff telegraphed Buster: "Will not be any trouble about brands,— merely used hash-knife as general brand your company. Buyer gone east for ten days. Answer if you will sign contract, yes or no." Buster on the same day replied, "I'm willing to sign contract covering all brands, but will not pay commission." Upon the receipt of this dispatch, plaintiff wired Buster: "At commencement correspondence about your cattle, May 26th, I stated, 'Have two buyers spayed heifers,' and showing clearly I was not the principal, and, if sale was made, it would be subject to my usual commission. You accepted price and terms, and I made contract, which has been executed by my buyer. My buyer is out of town, and, as you wish to back out, I will wire him that can duplicate purchase from you at much lower prices, and recommend that deal with you be dropped. I will not sell cattle for any one without commission, and cannot understand your course. My buyer will not pay any commission, and my expenses for telegrams in this matter are considerable. Brand matter all right. Answer."

This dispatch deserves to be noticed with some particularity. The telegraphic correspondence in evidence shows that, prior to Buster's notifying plaintiff that he would start at once for Montana, plaintiff had urged him to come and see buyer and arrange about brands, which seemed to be an obstacle in the way of consummating the sale. As soon as Buster notifies

plaintiff that he is coming, plaintiff wires him that his buyer "has gone east for ten days." In this dispatch now under discussion, plaintiff says: "At commencement correspondence about your cattle, May 26th, I state, 'have two buyers spayed heifers,' and showing clearly I was not the principal, and, if sale was made, it would be subject to my usual commission." The evidence does not bear out this part of the dispatch, in a single particular. This is clearly a misstatement of the facts as shown by the correspondence itself. Further on in this dispatch is this remarkable statement, coming from one who claims to be the broker of the defendant: "My buyer is out of town, and, as you wish to back out, I will wire him that can duplicate purchase from you at much lower prices, and recommend that deal with you be dropped." This seems to us strange language, coming from plaintiff, who claims to be the broker of the defendant, and consequently under legal obligation to act in good faith towards, and for the best interests of, his principal. It seems to us that, when matters had arrived at this stage, it became the duty of the plaintiff, if he claimed to be acting as defendant's broker, to have made some effort to arrange and settle the difficulties arising on account of the brands of cattle. He claimed that he could arrange the matters, and assured the defendant that there would be no trouble about brands. In a letter written by plaintiff to defendant after the deal had fallen through, he says, "I was legally acting as agent for both seller and buyer, and had a right to correct a clerical error or omission in a document drawn up by myself." This language appears strange, too, when we consider that the plaintiff testifies that he was acting solely for the defendant in the matter. This evidence does not impress us with the conviction that plaintiff was acting in good faith in the matter towards his alleged principal, or for the promotion of its best interests.

But, passing the question of the good faith of the transaction on the part of plaintiff, let us notice the further showing, in which plaintiff undertook to conduct the negotiations for his alleged principal. The defendant telegraphed a contract

to plaintiff that was free from any complications or difficulties as to brands, for signature, as shown above, supposing plaintiff to be the principal in the deal. Plaintiff saw fit not to adopt this contract, but prepared one himself that stated the cattle should bear the hash-knife brand on both sides, and, when objections were urged to it on that account, he assured his principal that no trouble would result therefrom; claiming authority or ability to adjust the difficulty with the buyer, and threatening to declare the deal off unless defendant signed it as he had written it. Upon the receipt of this rather remarkable telegram, W. E. Hughes, president of the defendant company, wired plaintiff: "Can't reach Buster, as' he is en route. Will stand by contract allowing commission. Is this final and satisfactory?" · Plaintiff replied it was satisfactory. It seems that Buster took the contract plaintiff had prepared and forwarded to the defendant, and went to Chicago, where he met Morris, the buyer. He there called the attention of Morris to the fact that the defendant did not have the number of cattle, or anything like the number, especially of spayed heifers, bearing the brand specified in the contract, and sought to have the contract amended so as to include other brands, from which defendant could furnish the number of cattle called for by the contract. Morris refused to take any other cattle than those branded with the hash-knife brand, as specified in the contract. Defendant could not possibly furnish that brand of cattle, to the number named in the contract, although anxious to do so from other brands. It does not appear anywhere that plaintiff, if he had the power or ability to remedy the contract as to the brands, ever did so, or attempted to do so. Morris having declined to take any cattle not in the hash-knife brand, and the defendant being unable to furnish the number of that brand mentioned in the contract, Buster wired plaintiff the contract was off.

From this statement of the facts, does it follow, as contended by counsel · for appellant, that defendant ratified the contract, and legally bound itself to pay plaintiff his commission, by the promise of Hughes to "stand by contract and al-

low commission ? '' Appellant's counsel contend that the court so found, as shown by finding No. 18. It is true that the court found in said finding that the voluntary acts of plaintiff in the transaction had been ratified. But the court attached no importance to this finding, as in connection therewith the court says the finding is outside of the pleadings, as the complaint alleged a refusal on the part of the defendant to ratify the contract made by the plaintiff. At any rate, this finding must be construed in connection with the other findings, if it is material at all. In finding No. 28 the court says : '' William E. Hughes, the president of the defendant company, promised, by telegram dated the 5th of July, 1890, to pay the plaintiff commissions at the rate of one per cent. upon the gross amount of the alleged sales of said cattle, but when he made this promise he had been assured by the plaintiff that the brand matter was all right.''

We think there is ample evidence to sustain the conclusion reached by the court that the pretended ratification of the contract made by plaintiff for the sale of the cattle, and the promise of defendant to pay commission, were based upon the assurance given by plaintiff that the brand difficulty would be arranged, and cause no trouble. The agreement to stand by the contract, and the promise to pay commission, were made upon such assurance on the part of plaintiff; and, but for such assurance, there is nothing in the record to sustain the contention that such agreement and promise would ever have been made by defendant. They were made upon a misunderstanding and want of knowledge as to the true facts of the case. For such misunderstanding and want of knowledge of the facts, plaintiff is certainly responsible. He was responsible for the complications and difficulties contained in the contract as to the brands of the cattle. He wrote it himself. He assured defendant that these difficulties could be removed, or would give no trouble. It was his duty to see that this was done. He did not do it, or attempt to do it. He left his alleged principal with a contract it could not comply with or enforce without expensive, serious and doubtful litigation. When defend-

ant became aware of the true condition of affairs, and ascertained that Morris would not accept a modification of the contract, it had a right to repudiate the action of plaintiff, which was valueless to it.  Before it can be contended that defendant legally ratified the acts of plaintiff, and agreed to pay commission, it must appear that the ratification and promise to pay occurred and were made with full knowledge of all the conditions and facts pertaining to the transaction.  This does not appear.  The court rightly so found.

There are but two material questions of fact involved in this case : First.  Did the defendant employ plaintiff, by express or implied contract, to sell the cattle mentioned in the complaint ?  Second.  Did the defendant legally ratify the acts of plaintiff in the matter of the contract and sale of the cattle, with a full knowledge of all the facts and conditions pertaining thereto, and, with such knowledge, agree to pay plaintiff the commission he claims ?  The court found on both these issues in favor of the defendant.  We think the evidence amply sustains the findings.

The appellant contends that the court erred in admitting in evidence a letter written by plaintiff to defendant, in which he admitted that he was legally acting as agent of both parties to the contract, on the ground that this letter was written after the contract had been abandoned.  But this letter contains an admission as to the capacity in which plaintiff was acting pending the negotiations in controversy and, we think, throws light upon the question of the good faith of plaintiff essential to a proper determination of the case.  We think it was admissible.

Having fully considered the assignments of error involved in this appeal, we are of the opinion that the evidence amply supports the material findings of fact made by the court.  The judgment and order appealed from are therefore affirmed.

*Affirmed.*

DE WITT and HUNT, JJ., concur.